Thank you, Your Honor. May it please the Court, Joel Kurtzberg from Cahill-Gordon on Rydell, on behalf of X Corp., I'd like to reserve five minutes for rebuttal. We'll try to help you. Thank you. At first blush, AB 587, the law at issue in this case, may seem like an innocuous transparency measure. And that, of course, is precisely what the government would like you to believe. But mandated transparency measures like AB 587 are much more problematic from a First Amendment standpoint than first meets the eye. That is perhaps best made clear by the extraordinary diversity of the amici that have filed briefs supporting our position that AB 587 is deeply threatening to the well-established First Amendment interests. We have people from all over the political spectrum, Reporters' Committee for Freedom of the Press, U.S. Chamber of Commerce, First Amendment scholars, conservative entities like the Washington Legal Foundation, all reflecting a deep concern about a statute that on its face is aimed at pressuring social media companies to change their content modification policies so as to carry less or even no expression that's viewed by the state as injurious to its people. Counsel, let me ask you this. If we were to determine that the content moderation sections of AB 587 were unconstitutional, as you suggest, what do we do with sections such as the high-level statistics at 22677 or the penalty provision at 22678? In other words, those that don't bear on content moderation and are strictly statistical in nature. What do we do with those? I think that the statistical—I'm sorry, I'm not sure which provisions you're referring to. The statistical requirements— I was referring specifically to 22677 and 22678. There are others, but I just point those out as examples. The statistics in 22677 are geared toward specific categories of content, and that is what we would suggest is what makes them problematic. So does the reporting of the numbers, in your mind, makes it content moderation? It's not that it is just reporting of numbers. Those provisions require social media companies to define these specific categories of content or decline to do so. I get that portion of it, I totally get it. I guess what I'm putting in without reference to specific code sections, it seems to me you've got different portions of this bill. You've got some that are content moderation, which are the ones that I think we're primarily fighting about, or you're fighting about, and then you've got those that are more typically commercial speech type. I'm not saying it is, but that type of request. The challenge that we have is as to the terms of service report, which requires either the definition or the declination to define those categories. And I get that. And also requires statistics, which is what I thought you were getting at, about speech that was so-called actioned that falls within those categories of content. We suggest, and it's not just because they're statistics, but the structure of the law is designed to apply pressure in a way that violates the First Amendment. And that was actually stated by the legislature and the governor and others as well, right? That is absolutely correct. And the law does that in two significant ways. It does it indirectly by forcing companies to make these disclosures about what the legislative history makes clear are the most controversial categories of so-called awful-but-lawful speech as part of an effort that the legislative history and the attorney-general openly admit was to get the public to pressure companies to limit these disfavored-but-constitutional  Roberts, I think the O'Brien case famously, and you can give me a review of our court's own precedent, told us not to look at what was the legislative history for purposes of evaluating the facial unconstitutionality of a provision. I think here one can look at the legislative history, notwithstanding O'Brien, because the very structure of the law itself makes very, very clear that it is signaling out these categories of disfavored speech, and the law itself implies, it's very, very clear that these are categories that people don't want to look at, which is what the attorney-general admits. Let me ask you a question. I'm going to ask it to the State as well about how this statute may work. The key provision here, subsection 3022-677, requires a statement of whether the current version of the terms of service defines each of the following categories of content, and if so, those categories. Does your client believe it would comply with the statute to turn in, as it already has, its terms of service? Say, there's our definitions. You decide for yourself. We have decided not to define these things. The statute only requires us to do it. If we do define those things, we are in full compliance, no problem. We think that that is problematic, Your Honor, and it is problematic for the reason that the State is compelling disclosures about specific categories of speech that they have used to frame this debate, and they have selected those categories in a way to try to generate controversy that will apply. Well, whatever reason they might have tried to do it, your terms of service are already posted by you, correct? I mean, they don't work if they're not. We are not challenging on this appeal the requirement that we post our terms of service. And so you haven't abandoned that claim, though. You just simply haven't appealed. That is correct. I mean, we're on a PI denial. Correct. And so your terms of service either define those categories or not. I think some of them do, some of them don't, right? And those are your definitions that you've already disclosed to your users. That is correct. And if they don't define those categories, where does the mandate that you're claiming from the law, the compulsion, to define those categories in ways that are any different from the way your terms of service define them? They don't mandate us to define the categories in a specific way, but they mandate us to take a position on what the legislative history makes clear are the most controversial categories to moderate and define. So I guess it can't be both. It can't be either that the law requires you to just explain whether your terms of service have these categories, if they do or not, and then also require you to define them. Which is it? Why can't, why isn't this statute susceptible of a reading that you simply, if you have, if you have already defined those categories, whatever California thinks, if you have decided to define those categories, great. Here they are. If you haven't, no problem. We think that, Your Honor, it is not wrong that we are entitled to respond to the statute by saying we don't define hate speech or racism, but the report also asks about policies that are supposedly, quote, intended to address those categories, which is a judgment call that is different than just saying if you do. And this is very helpful. Even if you don't yourself define those categories in the terms of service, you read the law as requiring you to opine or discuss those categories, even if they're not part of your own terms. If the categories are not part of our terms, then 22-677-A4A requires us to disclose about any existing policies that are, quote, intended to address those categories. So you, part of your position is you are required to tell California essentially your views on hate speech, extremism, harassment, foreign political interference, how you define them or don't define them, and what you choose to do about them. That is correct. And that those categories were chosen, as the legislative history makes clear, because they are the most, quote, unquote, fraught with political bias and the most difficult to define. And the intent, which is also very clear and that the Attorney General has conceded in part, is to have that controversy get the public to pressure the social media companies to do more to limit or eliminate those categories of conduct. And you have to, according to this bill, there's an assumption that based on what you say, you will change the content accordingly. So, for example, if somebody's talking about from the river to the sea or about Hunter Biden's laptop, they want to know what you're going to do about it under your policy, right, which requires you to make a value judgment. We do think it requires us to make a value judgment. It requires us to either define the categories that are flagged as the most controversial or to decline to define them, which also could be controversial to not define them. Mr. Kurtzberg, to rewind at the beginning, at the top of your argument, you talked about the transparency, and you probably saw this coming. We're thinking about Moody. Why aren't the — some of the transparency provisions, if we take out all the stuff we've been talking about for the last 10 minutes, if we take out those categories which you assert are problematic, how is the remainder of the statute distinguishable from the Texas and Florida laws that the Supreme Court left untouched in Moody? And why would we welcome a circuit split on something where it seems like Florida, Texas, and California are all agreed on and the Supreme Court has left alone? Well, first of all, your hypo excludes the main distinction between these laws and the laws in the Net Choice or Moody cases, right? So this law, unlike those, specifies categories of content that are picked to be controversial and are designed to be controversial. Stipulate it severable. Okay. So there's very little left if, in fact, you are going to remove those requirements from the terms of service report requirement in 22677. We would essentially be submitting the current version of our terms of service and if there are changes to the terms of service. But all of the statistics and the descriptions are the remainder of the provision that we are challenging. Well, what about so that — well, the statistics, if the statistics are untied to the categories, do not the — I forget whether it's Florida or Texas, but those laws, which, again, are on the books and have been left alone by the Fifth and Eleventh Circuits as well as the Supreme Court, how is this different once we take those problematic categories out? I don't think you can take them out because the statistics — As a matter of First Amendment law or California severability law? As a matter of severability, I also do think as a matter of First Amendment law and I do think that the Fifth and the Eleventh Circuits did get it wrong, but I think that this statute is distinguishable from those — from — for the reasons that Your Honor has accepted out in your hypothetical. But to address that hypothetical, the statistics and the detailed description are the gut of the terms of service report that we are challenging. You cannot say that somehow we read this statute under a severability analysis about providing statistics for something other than what the statute says the statistics are to be provided for. Counsel, did the Attorney General argue below the statute was severable? Yes, Your Honor. The Attorney General did argue that. So I guess that's the severability question. You've also said you have a First Amendment point and are asking us to disagree or do we want to invite the Supreme Court to revisit these issues so soon after Moody? We think you don't have to, Your Honor. And your hypothetical actually addressed the main distinction here between this case and the Moody cases. So we do think that this statute is more problematic as to these compelled disclosures about content moderation than those in Texas and in Florida. But those — okay. So those laws, as I understand, I think the Texas law, upheld by the Fifth Circuit, not touched by the Supreme Court, requires statistics of actions, content moderation actions. How is this different, again, once we take out the categories? Oh, if you take out the — that is the main distinction.  And the statistics here — That's clarifying. But just to be clear, it's not just as a matter of — as a matter of severability law. The statistics that are asked for here and the descriptions are completely linked to the categories. It does not say in the statute that you should just provide statistics about anything that was flagged, about any topic for any reason. It targets specific categories of content that were selected for the very reason that they are the most controversial ones with the most difficult decisions. Well, it does both, does it not? I mean, action — the action, content moderation, those are defined terms that refer to other statistics. In other words, your client would have other things they could disclose without pulling out those mandated categories. If you look at the statistics sections of 22-677, they are all linked to a detailed description of the content moderation practices that are intended to address the content described in paragraph three, which are those categories. There are some disclosures about how automated content is used as a — or whether human review is involved. Those disclosures are so unmoored from what this whole thing is about that there's practically nothing left. All of the disclosures are essentially about providing statistics about what was actioned or flagged as to those categories of content. So it's — when you accept the categories of content, the hypothetical, in my mind, there's very little left in actual practice when you look at what this terms of service report section of the statute, which is what our appeal is about, requires. Let me ask you this. We've talked about Moody a little bit, but my colleague, I think, suggested that Moody left the laws from Texas and Florida intact. My understanding is all they said is they didn't apply facial analysis properly and send it back without deciding whether either law survived. What's your analysis of Moody? So I think Your Honor is correct. They didn't make an ultimate decision, and I should, you know, qualify my answer. The section of the laws that dealt with disclosures about content moderation decisions was not — was not granted as to that point, except as to a very limited point, a provision that required detailed explanations of every content moderation decision. On that point, the Court simply — it was very, very clear. The Court applied Zouderer, and the concurring opinions made very clear that it did so because there was a forfeit of the argument. No one had argued anything otherwise. So I think it is a completely open question as to that. But the Fifth and Eleventh Circuit opinions, I see, Your Honor. No, well, yes, I think we're in vehement agreement on that. What I was referring to were the disclosure requirements that were — was the question that was not granted on the petition. And, yes, when I say they left them alone, it was the questions not granted. But just a, you know, a quick tie-up question here. But the majority says Zouderer applies unqualified. Why should we read so much into a concurrence's statement that it's forfeited rather than more justices telling us that Zouderer applies even to these content moderation questions? I think it is clear, if you could look at the briefings yourself, Your Honor, there was no briefing on that question. It was not contested. And I think when an issue comes before a court and an argument — and that's why the concurring opinions noted it, but it is a judicially noticeable fact that it wasn't fully briefed and contested. And I don't think a holding that Zouderer applies in that context really counts as a full holding of the court at the P.I. stage, especially. So just to close the loop here, I believe the court viewed NIFLA's consideration of controversial speech, which was part of your argument, as an application of Zouderer. So for the court to say that Zouderer applies to content moderation would not exclude an application of the NIFLA concern that you raise. Is that right? Is NIFLA — in other words, do you view NIFLA as an application of Zouderer? I think it's — that's a metaphysical question almost. That's why I asked it. Yes, I need help. I understand where you're coming from, Your Honor. I do. I think that it is clear that Zouderer does not apply if the speech is not purely factual and controversial. Now, whether one considers that a precursor to the test as to whether it applies or part of the test is metaphysical, but the practical effect is the same. And here, it is unequivocally clear that it is controversial. In fact, the law is intended to require disclosures about the most controversial content topics, the decisions that raise the most controversy, and it is also clear that it is designed to pressure the companies to change their policies, which, under another decision from the Supreme Court recently, the Vullo decision, is not permitted. The court there said that you can't coerce people, and the other part of Net Choice, of course, said that social media companies have the right, First Amendment right, to exercise editorial discretion as to what their feeds look like, and the government can't interfere with that. But Vullo also said that they can't do indirectly what they can't do directly. And if Net Choice makes clear they can't do it directly, Vullo makes clear they can't do it indirectly. So you're — And here, they do both. They try to do it directly and indirectly. Your contention, I gather, is that it does not apply here because it isn't just — it's not just factual. It's controversial. It doesn't meet the qualifications, as Justice Thomas said. That's a — it's a commercial speech issue. This isn't commercial speech from your perspective. You think that this is First Amendment covered and that strict liability applies, right? Strict scrutiny, Your Honor, yes. That is correct. I have not even gotten to the fact that there's direct pressure applied in this — in this context, and that part of our challenge here is, as applied, we provided a letter that went from the Attorney General that threatened the whole purpose of the letter. It's a November 2 — a November 3 letter that was sent to the CEOs of all the big social media companies, including my client. And the letter — the sole purpose of the letter was to urge the social media companies to change the way they moderate two of the categories of AB 587, disinformation and misinformation. And in that letter, the AG reminds the social media CEOs that AB 587 is now on the books and he will not hesitate to enforce that law once it comes into effect. And the evidence in the record is that that letter was interpreted as a threat. It is a letter that says you're not doing enough about getting certain content off of your platforms, and by the way, I have this power under this statute to enforce it and keep that in mind when you make your decision. Your time is up. Let me ask my colleague, does either have additional questions? All right, very well. Let's hear from the State. Thank you.  Good morning. Gabrielle Boutin on behalf of Attorney General Rob Bonta. Terms of service report requirements at issue here require platforms to disclose high-level information about their existing voluntary user terms of service and content moderation practices. This requirement merely compels commercial product disclosures and is subject to Zouder scrutiny. I'm sorry, counsel, and I'm sorry to interrupt you so early in your argument, but when I look at subsection 3 here, A3, where there's a requirement of a disclosure of whether you define and then later sort of why, why not, but of some of the most controversial aspects of speech, hate speech, racism, extremism, et cetera, et cetera, et cetera, it's just hard for me to see that this is commercial speech, this is just random commercial speech part of a commercial transaction. So how can requiring the companies to do all this on categories A through E get to Zouder and commercial speech? Your Honor, under CTIA, a disclosure is uncontroversial even if it can be tied in some way to a controversial issue and even if it can be used by others to support arguments in a heated political controversy. Forgive me. I want to be sure I understand your position. I thought that the State had, in effect, stipulated that, in effect, the intent here was to compel people to moderate what they're doing with respect to hate speech, et cetera, and the other things my colleague referred to. Is that wrong? That's not correct, Your Honor. Our position is— What about the letter from the AG that was referred to him a minute ago? Your Honor, that letter has been grossly distorted in this action. And what does the letter say? The letter is eight pages long. The statute is barely mentioned once in a footnote. He never suggested or said he would use the statute to coerce any particular content moderation policies. All he said is he noted the statute was upcoming over a year later and that the platforms would then have to comply with the statute's transparency obligations. In other words, they would have to disclose to the public what they're actually doing. There was no threat saying, if you do not use these categories for content moderation, then we'll investigate you under this statute. Ms. Putina, I guess, unlike CTIA, there is an identity here of the law and the controversy. I think that's the claim here. What does—what do the categories add to the disclosure? I spoke with your friend a little bit about some of what Florida and Texas were doing with respect to disclosures. You already have their terms of service. The terms of service either provide these categories or they don't. Why is that not enough for California? Your Honor, the categories are categories of content that are often, just as a matter of fact, moderated by social media platforms. By including them in a terms of service report, you're putting all of these reports in one place on the Attorney General's website. It is provided to the public as required by the statute, and therefore in one place the public can compare what, if at all, each of these companies may be doing with respect to certain types of categories of information. And, Zinda, I guess to come back to where I started with your friend, do you view the law, setting aside the disclosures, does the law require a company to define those categories and provide those categories in response to it, or could it simply just provide its terms of service agreement? Your Honor, all it would have to do in the report is to say that we do not define this category, and therefore they would not have to provide any definition of the category. Then how does it provide the disclosures that are required by the next subsection? The statistics? The statistics. Oh, the statistics. Well, Subdivision 5A says that they must provide information on content that was flagged by the social media company as content belonging to the categories described in paragraph 3. So that's factual. They can only report statistics that they have based on actions that they actually took, based on categories that actually exist. Categories that actually exist in the State's mind or in the company's mind? Oh, in the company's mind, because this refers to— And only as provided in their terms of service? So if their terms of service don't speak to the categories the way the California Legislature has spoken to the categories, X and other companies are free not to disclose. Well, is content belonging to any of the categories described? I mean, I think there may be an assumption that if they're in the terms of service as categories that they moderate content by, then 5A would be applicable. I think certainly it's a facial challenge. I think if we back up for a minute— But before you do that, I mean, when you look at 4 and 4A, there has to be a detailed description of content moderation practices used, including but not limited to all of the following. Any existing policies intended to address the Category 3 category. So they have to give you everything that they've got on what they believe to be hate speech, or racism, extremism, harassment, foreign political interference, because those aren't defined terms, right? All that means is, is there, as a matter of fact, an actual company policy that exists to address those categories? There's no— However they define them, because they're not defined in the statute, right? If the company chooses to define those categories as an official matter, as an official company policy, in essence, it's only if—it's essentially an undisclosed terms of service, right? But if they, for example, have nothing where they address what they consider to be hate speech, they have to tell you that, right? They have to essentially say, we have nothing that we have that addresses anything that we consider to be hate speech, right? If that—if they do not have an official office policy about hate speech, yes. I would also add, however— And not compelled speech? To compel the—yes, but it's a purely factual matter whether or not they have an official policy about whether they moderate by that. So are the healthcare-related disclosures in NIFLA, but those were unconstitutional. How would you distinguish that? Healthcare disclosures. Well, I think—so it depends what prong of Zouder we're referring to. Well, that those were—those, I think—I think California in those arguments said purely factual, and the Supreme Court said maybe, but also controversial, unconstitutional. Sure, and I think the difference here is that in NIFLA, the court was focused on whether or not the entity or person was required to make—to speak a message that's not about its own products or services and that's contrary to its own viewpoint. And that description of what the test is for uncontroversial is very much reiterated in CTIA. It's not about—again, it's not a matter of, is this a controversial topic? It's, are we forcing the speaker to make a disclosure about something other than their own product, service—product or services— Well, if their product or service is, for whatever reason, not one that purports to moderate foreign political interference content or hate speech or racism, aren't you forcing them to then disclose, speak to say, we are a company that permits hate speech or we are a company that does not permit hate speech? Isn't that disclosure required? And how is that different? It's not different because we have to be—well, we have to be thinking of, because I think we've gotten away from the fact that these platforms— But if it's—yeah, if it's not different from NIFLA, I think you lose. Well, it is different from NIFLA in the uncontroversial respect. Because, again, controversial—controversial has to do with whether you're forced to disclose a message about someone else's services that's not about your own product, which this is. This is about their own product. But forcing them to disclose either here's how we define hate speech and what we do about it, or we don't really care about hate speech. We let—we have no policies on it because we let anybody say anything, whether we consider it to be hate speech or not. That is not compelled speech that's subject to strict scrutiny when they basically have to tell you what their position is on, for example, hate speech and whether they want to do anything about it or not. Your Honor, it's not a matter of company. What is your ideology on hate speech? This is—the terms of service are a contract between the— and ExCorp very clearly says that in its own terms of service. It's a contract for use of a product. And it would be the same if the statute said you need to put in the terms of service how all of your officers voted in the last election, that that wouldn't count as compelled speech because you've put it in a bucket called terms of service? No, there's absolutely a difference here. One, the distinction is that you apply zowder when it has to do with a disclosure specifically about a product or service. What board members voted, the subjective opinions about officers within the company, that's very clearly outside of that definition. But consumers have the right to understand what are the rules? Am I using this service? What am I going to have in front of me? Well, then they get that from the terms of service. Why do they have to have these categories? If the categories aren't in the terms of service, again, this is the— how is it not a compulsion that the state is saying your terms of service may be what they are, but we also want you to tell us about these controversial topics even if they're not in your terms of service? Well, I think we're getting away from the doctrinal analysis here for zowder, and I think what you're getting to is, is there a rational—I want to get the test right. Is it reasonably related to a substantial state interest? That's all that's required under zowder. You have to show that purely factual and uncontroversial, and as you've heard, we're all concerned about the fact you've got this list of things that have to be disposed. Companies could have terms of service, not discuss any of them. The state is saying you must tell us what—basically what you think about each of these things, and if you don't, you've got to tell us that, too. Why is that not compelled speech? Because, again, it is not what you think about these things. It is what does your product do? What are—how is your use of the product affected? You're still compelling them to say that. Correct, but again, it's a commercial product disclosure. Before they have to say anything. It's a private company. They have terms of service. They may or may not talk about things. Say they don't say anything. This statute says you've got to tell us. Even if you don't have a policy, you can say we don't have a policy, and that's compelled speech. Is it not? That's right, and you apply zowder in the situation of compelled speech. It's purely factual and uncontroversial, and what you're concerned about is it's neither. Well, and again, Your Honor, I think one needs to go back to the rule for how uncontroversial is defined. It's not about whether or not the disclosure itself, which, again, is a statistic or statement of a matter of fact about whether there's an official policy about what the product does or does not do. It's not whether that is related to a controversial issue about whether platforms should moderate this content. It's are you being forced to state a message not about your product, and that is contrary to your message, and I'd like to give a hypothetical about to compare this. So let's say there's a company that produces food or some kind of supplies, and they take an ideological stand. They're very vocal about it, about, you know, if it's food, it's non-GMOs or, you know, only recycled materials, those kinds of things, right? Would you be able to have a statute, particularly in the food context, mandating that they disclose what the ingredients are, including GMOs? That's totally different. That and tobacco and so on, you know, they have to say what's in there that's not controversial. It's what's in there. It's a fact. But here, you're compelling people to say things that they may or may not want to talk about at all, and there are a whole list of them. You've got representatives on both sides from the whole First Amendment Bar of the United States that's concerned about this, which in and of itself says this is controversial. Can I maybe – can I try a slightly different example? The San Francisco Chronicle's op-ed page or letters to the editor policy. Could California require purely factual disclosures of what – how they're planning to address ideological balance on their letters to the editor page? How they're planning to address. And how is that different from – that is the old-fashioned form of content moderation. It is clearly protected under Redline and other cases. I think – I mean, I think you'd have to go through the Zauderer analysis. And where does that end up? It may be a distinction without a difference. Sure, we might start with Zauderer. The question is where do we end up? And why wouldn't we end up in the same place with that law as we would with this law, that under NIFLA it's controversial even if fact-based and unconstitutional? Again, I think – I think the focus – I guess I don't know how many more times to say. I don't think the controversial analysis that you're describing is in line with the way that CTIA describes what that word means.  Maybe – could you talk to severability a bit? I would. And may I also speak to Moody just very briefly? Because we have not had a chance to respond to what actually the court says in Moody. I would just like to say it's not a pure assumption because the issue was briefed. It was briefed in the Texas case. The issue whether Zauderer applies was briefed by NetChoice in the Texas case in the Supreme Court briefing, and it was briefed by both sides below in the circuit court briefing. The majority itself does not say that they're making an assumption. They stated twice that you apply Zauderer to content moderation. But then I believe it goes on to say that the Fifth Circuit's approach to the content moderation was it kind of calls out and says that was incorrect. There are more constitutional problems here than we foresee. Why is that not analogous, at least with respect to the categories here? Because – well, I think I understand your question. Because the court found that there have been mistakes in the application or there may have been mistakes in the application of Zauderer scrutiny, but that doesn't – it didn't say that the Fifth Circuit was incorrect to apply Zauderer. So I'm referring to the fact that the Fifth Circuit certainly said that Zauderer applies. That is my point here. That's the starting point, but we have to reach the end point. Yes, I understand. Which is where does Zauderer take us? I understand. No, and so Moody takes us – I don't mean to suggest that Moody takes us further than establishing the appropriate standard of review, which is being Zauderer. But Zauderer can also tell us what is not commercial speech. That's the standard we're looking at. But if it's – you know, if we're talking about something that's controversial, just strictly numerical, that's one thing. But again, even if you look at Zauderer, how does that really help the state in this case? If you look at Zauderer, how does it help the state in the sense of how the prongs apply? You're claiming it's just a regular commercial speech? It's like a tobacco disclosure? What's in the product? Well, again, I would point to Moody and I would point to both Net Choice cases in which it was the same type of speech at issue. It was content – facts related to content moderation. It's a little different than those. The statute's a little different than both the Texas and the Florida case, as I recall. As a matter of fact, I may be thinking of the earlier case, but isn't this statute modeled after one in England? I think – It might have been the other case. I'm not sure. Yeah, okay. Yeah, I don't think it's the case. I wonder – thanks for sticking around. So could you speak to severability? Yes, thank you. Before you speak to it, can you add to your answer to Judge Johnston's question whether your brief to us discussed severability? I think we do mention that it's – I believe our brief to you. Yes. Your brief on appeal. I don't recall if we discussed that. We did – we certainly raised that below, and the judge – and the district court did not make any finding on that issue. So if the court – Please answer. That's fine with my question, but please answer Judge Johnston's. Oh, certainly. I'm sorry to interrupt you. I mean, we certainly think that the provisions within the terms of service report are severable. We think they're grammatically severable. We think that the attorney general would still want the information that may not be as much at issue here today. Okay. To get a little more, I guess, granular, maybe just like the last case, we've got four – maybe four buckets again. The reporting the terms of service, the description of content moderation practices, the data reporting, and then the categories that we've spent most of the morning talking about. Which parts of those are salvageable if assuming the content categories are struck down? Well, Your Honor, they should all be salvageable, but – But how? So, for example, with the data reporting, do you agree with your friend that the data reporting is entirely keyed to the categories, so that if the categories don't exist, there's nothing to report? So, I believe you're referring to subdivision 5A, and it says, information on content that was flagged by the social media company as content belonging to any of the categories described in paragraph 3, including all the following. Your Honor, as I sit here, I'm hesitant to make a snap judgment on that. I think that, again, because the district court didn't decide this issue, I think it would be better to remand – if the court were to decide that any part were subject to a preliminary injunction, I certainly would ask that the court remand as to that issue. And I would just bring up one other case for your consideration, Your Honor, and admittedly, this was not in our briefing, but I believe Judge Bennett was on the panel that issued this opinion, and that's Twitter v. Paxton, and it's 56 F. 4th, 1170, 9th Circuit, 2022. And in that case, Twitter brought suit because there had been a civil investigative demand by the Texas AG relating to their content moderation policies. This court found that injuries asserted were not ripe, and part of the reason for that is because the idea of subjective pressure on the social media platform was not sufficient to constitute a cognizable injury for the challenge. That case didn't have a required report semiannually or in any other time frame, did it? I think that's a fair distinction, but I think it's also notable that many of their theories and allegations of injuries and part of their challenge also have to do with how the Attorney General can and may enforce the disclosure requirements and conduct, hypothetically, an investigation. So to the extent that any of their injuries are premised on the burden of any investigation, we don't think that's ripe. I also would just add, as far as just creating pressure, I also don't think that is a concrete injury that's been shown here. Again, that Twitter case states that a subjective statement generally of chilling and of feeling pressure is insufficient. And in Twitter, there actually had been meetings and discussions inside the company about whether and how to change their policies because of the civil investigative demand. There's not even evidence of that.  Do either of my colleagues have additional questions at that? Now, we used up your time, so we're going to give you a couple of minutes of rebuttal. Okay? Thank you, Your Honors. Just a few points. First, I do want to focus on the November 3, 2022 letter, which they said was exaggerated. It is in the record at ER 1067 through 74. Mr. Kurtzberg, as you answer this, should it make a difference that Voolo involved executive branch action and this involves legislative branch action in terms of the challenge, right? In Voolo, they were challenging a State official, whereas you're not challenging the letter. You're using the letter as a backdrop for your challenge to a statute. Should that matter? I don't think that it does matter, Your Honor. Here, there is the very person who is authorized to enforce a law making a threat to enforce the law in the context of a letter that, again, they say it was only the 587 is only in a footnote. That is not correct. But in the context of a letter, the sole focus of which is about how the social media platforms are not doing enough and they have a duty and an obligation and it's a moral duty and a legal duty to do more to keep disinformation and misinformation off of their platforms. And in the midst of the letter that says you have to do something to change your policies because it's not good enough, there is a section that is entitled on ER 1070. The State of California has a mandate to protect its citizens' voting rights. In that section, that's where AB 587 is mentioned. There are eight California statutes that are mentioned. And after a sentence that is about AB 587 in the text, it says, In 2024, social media platforms will also have additional transparency obligations as required by recent State legislation that requires disclosures on content moderation practices as it relates to extremism or radicalization, disinformation or misinformation, and foreign political interference, among other areas. The very next sentence of the letter, very next sentence, says, The California Department of Justice will not hesitate to enforce these laws against any individual or group who violates them. The whole purpose of the letter is to get the companies to change their policies. If this is nothing other than a transparency statute, why did it occur to the Attorney General, why did it occur to even reference a transparency statute in a letter, the sole purpose of which is to get them to change their policies about two of the categories that are covered by the statute? Okay, we've given you a couple extra minutes. I know you could talk a lot longer, both of you, but let me ask my colleagues, if either of you have additional questions. Thank you for your arguments. They're very helpful. This is very useful to us. We will act upon it soon. Before the case just argued is submitted, I know we have a number of, I think it's students who are here today. The court's unfortunately not going to be able to meet with you, but our law clerks will do so. So if you'll please stand by for them. The court stands adjourned for the day. Thank you, Your Honor. All rise.
judges: SMITH, BENNETT, JOHNSTONE